**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-00296-CMA-CBS

JEFFREY A. WEINMAN,

      Plaintiff,

v.

MICHAEL J. MCCLOSKEY,
PAUL E. MAXWELL,
JEFF A. KELLY
MICHELE B. MARURI,
PAUL E. SKRETNY,
KENT R. SNODGRASS
THEODORE ABARIOTES,
WILLIAM SNIDER,
VINTAGE DELAWARE HOLDINGS, INC.,
UWBI GROUP, LLC, and
JOHN DOES 1-10

      Defendant(s).

---

**ORDER GRANTING IN PART AND DENYING IN PART DIRECTOR DEFENDANTS'
MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART THE UWBI
GROUP'S MOTION FOR JUDGMENT ON THE PLEADINGS**

---

This matter is before the Court on two motions: (1) the Motion to Dismiss filed by

Defendants Michael J. McCloskey, Paul E. Maxwell, Jeff A. Kelly, Michele B. Maruri,

Paul E. Skretney, Kent R. Snodgrass, Theodore Abariotes, and William Snider

(collectively, the "Directors") (Doc. # 72), and (2) Defendant UWBI Group LLC's

("UWBI's") Motion for Judgment on the Pleadings, Pursuant to Fed. R. Civ. P. 12(c)

(Doc. # 126).

# I.     BACKGROUND

## A.     FACTUAL ALLEGATIONS

This case is brought by Jeffrey A. Weinman, the Chapter 7 trustee of the bankruptcy estate[1] of UWT, Inc., a subsidiary of Bancorp.[2]  Plaintiff asserts two claims against the Directors: (1) negligence; and (2) breach of fiduciary duty, in connection with the Directors' authorization of the sale of UWT's corporate assets and the subsequent distribution of the sales proceeds.  Generally, Plaintiff alleges that "Bancorp[] stripped the assets of one of its subsidiaries, UWT . . ., in order to shore up the lack of capital liquidity in another subsidiary . . . ."  (Doc # 86 at 1.)

In 2008, UWT (then known as Sterling Trust Company), was a Texas company with its primary offices located in Waco, Texas.  It was a custodian of self-directed individual retirement accounts (IRAs) and a vehicle for individuals to buy IRA investments.  (Doc. # 119 ¶¶ 40-41.)  UWT had a business relationship of some sort – though the Complaint does not make the details of this relationship clear – with Superior Gold Group, LLC ("SGG"), a Nevada company.  SGG ran advertisements encouraging prospective investors to invest their IRA savings in gold and other precious metals.  (*Id.* ¶¶ 69-70.)  To do so, consumers would open a self-directed IRA with UWT and were told that UWT would invest in gold and precious metals once the retirement funds were received.  However, once UWT received the funds, it would wire them to SGG's bank – and thereafter, the funds would disappear (the Complaint refers to this entire

---

[1] A bankruptcy case is currently pending in the United States Bankruptcy Court, District of Colorado, Case No. 13-13184-EEB.

[2] Bancorp is not named in this action.

arrangement as the "Precious Metals Scheme").  Despite the disappearance of the

funds, UWT continued to book the IRAs' value as if the accounts were fully funded

and/or secured with precious metals and gold, and also provided false statements to

customers, reflecting the fully funded value of the IRA accounts listing the precious

metals as assets.  (*Id.* ¶ 73-75.)  Plaintiff alleges that  UWT and a group of its directors

(McCloskey, Kelley, Maruri, Maxwell, Skretny, Snodgrass and Snider, hereinafter the

"Sterling Defendants"), "knew that the Precious Metals Scheme resulted in few if any

actual precious metals transactions and that the retirement funds would disappear after

receipt by SGG."  (*Id.* ¶ 76.)  Specifically, the Complaint alleges that "no precious metals

were delivered at all in exchange for customer payments totaling $3,971,269.91."  (*Id.* ¶

79.)  Moreover, the Sterling Defendants "and officers of UWT did not notify the []IRA

account holders who participated in the Precious Metals Scheme that their retirement

funds were gone and that there were no precious metals held for their benefit."  (*Id.* ¶

80.)

     In October of 2008, the Sterling Defendants began negotiating the sale of UWT's

Trust Business.  Between October of 2008 and when the Trust Business was ultimately

sold, "the Sterling Defendants knew that UWT had contingent liabilities of approximately

$4,000,000 arising from UWT's knowing participation in the Precious Metals Scheme."

(*Id.* ¶ 81.)   Additionally, "the Sterling Defendants took steps to ensure that the

$4,000,000 of known contingent liabilities would be omitted from the books of UWT."

(*Id.* ¶ 82.)

In June of 2009, the Directors authorized UWT to sell its profitable Trust business for approximately $61.2 million.  (*Id.* ¶¶ 42, 43-44.)  Of the approximately $61.2 million in proceeds from this sale, $15 million was paid in cash, and the balance (approximately $47 million, hereinafter the "Installment Obligation") was payable through a promissory note with a seven-year term.  (*Id.* ¶¶ 47-48.)

Thereafter, the Sterling Directors caused UWT to enter into a Contribution and Assignment Agreement with Vintage Delaware, assigning the entire Installment Obligation to Vintage Delaware; Vintage Delaware entered into a Contribution and Assignment Agreement with the Vintage Group, LLC, a wholly owned subsidiary of Bancorp, to assign the Installment Obligation to Vintage Group, LLC.  Vintage Group, LLC, in turn, entered into a Contribution and Assignment Agreement to assign the Installment Obligation to Bancorp.  (*Id.* ¶¶ 49, 51, 53.)  All of these Contribution and Assignment agreements were signed on June 29, 2009, and Bancorp received the proceeds that same day.  (*Id.*)  Subsequently, Bancorp transferred approximately 92.5% of the Installment Obligation to United Western Bank, retaining 7.5% of the Installment Obligation (valued at approximately $3.5 million).  (*Id.* ¶ 57.)  In exchange for 92.5% of the Installment Obligation, United Western Bank transferred $42 million in mortgage-backed securities to Bancorp.  (*Id.* ¶ 57.)  Plaintiff alleges that the Sterling Defendants failed to obtain anything, however, for UWT in exchange for this sale.  (*Id.* ¶¶ 50, 52, 54.)

Following the sale of the Trust Business, the Sterling Defendants transferred $13.3 million in cash to Vintage Delaware.  (*Id.* ¶ 59.)  This cash was subsequently

transferred from Vintage Delaware to the Vintage Group, Inc., and then from Vintage

Group Inc., to Bancorp.  (*Id.* ¶¶ 59, 61, 63.)  Plaintiff alleges that the Sterling Defendants

also failed to obtain anything for UWT in exchange for the transfer of the $13.3 million in

cash.  (*Id.* ¶¶ 60, 62, 64.)  Plaintiff also alleges that, as a result of the Director's actions

(in selling the business and transferring both the cash proceeds and the Installment

Obligation), that "UWT was, or may have become, insolvent after the transfer of the

Trust Business Proceeds, or may have been left with assets which were insufficient to

sustain its business or satisfy its creditors." (*Id.* ¶ 68.)

In or about March of 2011, Bancorp formed UWBI Group, a limited liability

company, and transferred the remaining portion of the Installment Obligation with a face

value of $3,272,802.26 to UWBI.  (*Id.* ¶¶ 85-86).  Shortly thereafter, Bancorp sold 100%

of the membership units in UWBI for a purchase price of $1,937,748.91. (*Id.* ¶ 91.)[3]

Two years later, in September 2011, a different set of directors – McCloskey,

Theodore Abariotes, and Paul E. Maxwell (hereinafter the "UWT Defendants") –

authorized UWT (which by that time had moved and reincorporated in Colorado) to sell

its other, remaining business, a viatical business,[4] for approximately $700,000 in cash.

(*Id.* ¶ 66.)   Plaintiff asserts that this $700,000 in cash was "dissipated" and not used to

pay creditors of UWT, and that following the sale of the Viatical Business, UWT no

---

[3] Hereinafter, the Court refers to the distribution relating to the sale of the Trust Business as the "2009 Distribution."

[4] Viatical businesses facilitate "life settlements," wherein a life insurance policy is purchased from the original insured for an amount less than the face amount of the policy, and when the original insured dies, the full policy proceeds are paid to the purchaser of the policy.  (Doc. # 119 ¶ 94.)

longer had sufficient assets to continue its commercial enterprise or pay creditors.

Accordingly, the UWT directors caused UWT to become insolvent.   (*Id.* ¶ 66).[5]

## B.    PROCEDURAL HISTORY

After Plaintiff filed its Third Amended Complaint, the Directors filed the instant

Motion to Dismiss for failure to state a claim on July 31, 2014.  (Doc. # 72.)  On October

15, 2014, Plaintiff filed a Motion to Amend the Complaint and file a Fourth Amended

Complaint (Doc. # 103), and on November 18, 2014, Magistrate Judge Shaffer granted

Plaintiff's Motion (Doc. ## 118, 119).  Director Defendants filed a Notice of Applicability

of their Motion to Dismiss as to the Plaintiff's Fourth Amended Complaint on December

5, 2014 (Doc. # 120), and Plaintiff filed its response, with 12 attached exhibits, on

December 26, 2014 (Doc. # 122).  The Director Defendants filed their Reply in Support

of the Notice of Applicability on January 9, 2015.  (Doc. # 124.)

Defendant UWBI filed the instant Motion for Judgment on the Pleadings Pursuant

to Fed. R. Civ. P. 12(c) on February 11, 2015.  (Doc. # 126).  Plaintiff responded on

March 4, 2015, and UWBI replied on March 23, 2015.  (Doc. ## 128, 131.)

## II.  <u>STANDARD OF REVIEW</u>

Rule 12(b)(6) provides that a court may dismiss a complaint for "failure to state a

claim upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  In deciding a

motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual

allegations . . . and view these allegations in the light most favorable to the plaintiff."

---

[5] Hereinafter, the Court refers to the distribution relating to the sale of the Viatical Business as the "2011 Distribution."

*Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (*quoting Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A court deciding a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) applies the same standard applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1160 (10th Cir. 2000).

"The pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting and citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted; alterations incorporated)).  As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*,  "the mere metaphysical possibility that **some** plaintiff could prove **some** set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that **this** plaintiff has a reasonable likelihood of mustering factual support for **these** claims."  493 F.3d 1174, 1177 (10th Cir. 2007).

Further, "only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will  . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged –

but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679

(internal citations and quotation marks omitted; alterations incorporated).  Thus, the

burden is on the Plaintiffs to "nudge [their] claims across the line from conceivable to

plausible." *Twombly*, 550 U.S. at 570.  The purpose of this pleading requirement is two-

fold: "to ensure that a defendant is placed on notice of his or her alleged misconduct

sufficient to prepare an appropriate defense, and to avoid ginning up the costly

machinery associated with our civil discovery regime on the basis of a largely

groundless claim." *Kansas Penn Gaming*, *LLC v. Collins*, 656 F.3d 1210, 1214 (10th

Cir. 2011) (internal quotation marks and citations omitted).

Generally, a court considers only the contents of the complaint when ruling on a

Rule 12(b)(6) motion.  *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

However, in its Response to Directors' Notice of Applicability of the Motion to Dismiss to

Plaintiffs' Fourth Amended Complaint (Doc. # 122), Plaintiff attached twelve exhibits that

were not attached to the Fourth Amended Complaint, nor to the prior versions of the

Complaints, primarily consisting of emails sent between the Sterling Directors.  Plaintiff

explained the attachment of the exhibits by stating that "Now that the Trustee has had

the opportunity to thoroughly search and review the vast amount of ESI [Electronically

Stored Information] . . . over the objections of the Director Defendants, additional

evidence that the Director Defendants breached their fiduciary obligations and actively

concealed evidence of their actions has been discovered." (*Id.* at 2.)  Defendants'

Reply in support of their Notice of Applicability opposed the Court's use of these exhibits

in consideration of the Motion to Dismiss.

A Court may consider materials in addition to the pleadings in certain limited circumstances.  For example, if a plaintiff does not incorporate by reference or attach a document to his or her Complaint, a defendant may submit an undisputably authentic copy which may be considered in ruling on a motion to dismiss.  *GFF Corp.*, 130 F.3d at 1384; *see also Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005) (a document which is "central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.")  The Court may also take judicial notice of a fact which is not subject to reasonable dispute, a requirement that is satisfied if the fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The documents submitted by Plaintiff, however, are neither "undisputably authentic" nor subject to judicial notice. Accordingly, the Court will not consider these exhibits in resolving the Motions.

### III.  ANALYSIS

Defendant Directors contend that this case should be dismissed because (1) with respect to Plaintiff's claims regarding the 2009 distribution, Texas law provides that these claims are time-barred as well as barred by the Business Judgment Rule; and (2) with respect to Plaintiff's claims regarding the 2011 distribution, Colorado law provides that Plaintiff's claims with respect to the 2011 distribution are barred by the business

judgment rule.[6]   The Court addresses each argument in turn.  Thereafter, it turns to

UWBI's Motion for Judgment on the Pleadings (Doc. # 126.)

## A.   THE 2009 DISTRIBUTION

At the time of the 2009 distribution, UWT was known as Sterling Trust Company,

a Texas corporation.  (Doc. # 119 at ¶ 7.)  Accordingly, the Court must resolve what law

applies prior to determining the adequacy of Plaintiff's claims as to the 2009

Distribution.  Directors argue that the Court should apply Texas law, and cite the internal

affairs doctrine, which the United States Supreme Court has described as "a conflict of

laws principle which recognizes that only one State should have the authority to

regulate a corporation's internal affairs – matters peculiar to the relationships among or

between the corporation and its current officers, directors, and shareholders – because

otherwise a corporation could be faced with conflicting demands."  *Atherton v. F.D.I.C.*,

519 U.S. 213, 224 (1997).  The Restatement's iteration of the internal affairs doctrine –

which Colorado applies in making choice of law questions pertaining to corporate

governance, *see Ficor, Inc. v. McHugh*, 639 P.2d 385, 391 (Colo. 1982), provides that:

> The local law of the state of incorporation will be applied to determine the
> existence and extent of a director's or officer's liability to the corporation,
> its creditors and shareholders, **except where, with respect to the
> particular issue, some other state has a more significant relationship
> under the principles stated in § 6 to the parties and the transaction,**
> in which event the local law of the other state will be applied.

---

[6] Defendant Directors also argue that the case should be dismissed because, citing Federal
Rules of Civil Procedure 8(a)(2) and 10(b), the Complaint improperly combines claims based on
the 2009 and 2011 distributions in each count.  Rule 10(b) provides, in relevant part, that "If
doing so would promote clarity, each claim founded on a separate transaction or occurrence . . .
must be stated in a separate count or defense."  Although the Court agrees that Plaintiff's
drafting of the Complaint was not the model of clarity insofar as entirely different directors
authorized the 2009 and 2011 distributions, the Complaint provides Defendants with adequate
notice of the claims against them.  Dismissal is not a proper sanction on this basis alone.

Restatement (Second) of Conflict of Laws § 309 (1971) (emphasis added).

Plaintiff, in contrast, contends that the Court should apply the law of the forum state (here, Colorado), unless Defendants show that there is an "outcome-determinative" conflict between Colorado law and another body of law that is arguably applicable.  Plaintiffs cite *Iskowitz v. Cessna Aircraft Co.*, No. 07-cv-REB-CBS, 2010 WL 3075476, *3 (D. Colo. Aug. 5, 2010), a diversity tort action with little applicability to the corporate governance context here.  Without providing his own analysis, Plaintiff also argues that under the Restatement, the Court must "undertake the full Restatement (Second) Conflict of Laws § 6 analysis, as it would with any other conflict-of-laws issue." (Doc. # 86 at 6.)

Where, as here, federal question jurisdiction is invoked,[7] federal courts generally apply federal common law principles to resolve choice of law disputes.  *Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.,* No. 11-CV-252-GKF-PJC, 2012 WL 4006122, at *4 (N.D. Okla. Sept. 12, 2012) (citing cases).  "[C]ircuit courts have concluded that a federal common law choice-of-law analysis should be conducted when the issue is a federal question, and . . . courts have relied upon the Restatement (Second) of Conflicts of the Law for the content of federal common law."  *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 809 (5th Cir. 2009).

---

[7] The case was brought under 28 U.S.C. § 1334(b) and (e)(1).  (Doc. # 119 ¶¶ 1-2.)

Accordingly, the Court looks to the Restatement and applies Texas law to the 2009 transaction.[8]  Plaintiffs provide no analysis whatsoever as to why the state of Colorado has a "more significant relationship" to the parties and the transaction here than the state of Texas.  In contrast, Sterling Trust Company was incorporated in Texas, the sale of the Trust business was negotiated in Texas, and the sale (and the resulting distributions at issue) occurred in Texas.  In the absence of any compelling countervailing interest, "certainty, predictability and uniformity of result, ease in the application of the law to be applied and, at least on occasion, protection of the justified expectations of the parties" results from applying the law of the state of incorporation. *In re ms55, Inc.*, No. 10-CV-00042-PAB, 2011 WL 1084967, at *6 (D. Colo. Mar. 21, 2011) (citing the Restatement and noting, "[a]lthough the Restatement would under some circumstances allow a court to apply the law of a state other than the state of incorporation, the comments suggest that this exception to the general rule is narrowly drawn.")

The Texas Business Organizations Code (TBOC) § 21.303 governs wrongful distributions in Texas.  As applicable here, it provides that corporations may not make distributions if the corporation would be insolvent after the distribution or if the distribution would exceed the distribution limit.  TBOC § 21.303(b).  It is subject to a two-year statute of limitations. *Kan. Reinsurance Co. v. Cong. Mortgage Corp. of Texas*, 20 F.3d 1362, 1374 (5th Cir. 1994).  Directors contend that because TBOC §

---

[8] For the same reasons, the Court will apply Colorado law to Plaintiff's claims relating to the 2011 distribution, as that transaction was negotiated in and occurred in Colorado (and, in any case, both parties agree that this is the correct law to apply).

21.30 is the "exclusive remedy under Texas law for a wrongful distribution," and that because Plaintiffs' cause of action arose in June of 2009, but they did not bring their claims until after June of 2011, these claims are time-barred.  (Doc. # 72 at 7, 8.)

Plaintiff disputes that TBOC § 21.30 is the "exclusive remedy" here.  Plaintiff also counters that the statute of limitations was tolled in any case, as to both his fiduciary duty claims and Plaintiff's negligence claims, by virtue of the "discovery rule," which "defers the accrual of a cause of action until the plaintiff knows or, in the exercise of reasonable diligence, should have known of the wrongfully caused injury."  *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex. 2001); *see also USPPS, Ltd. v. Avery Dennison Corp.*, 326 Fed. App'x 842, 847 (5th Cir. 2009) (internal citation omitted) ("The rule postpones the running of the statutory limitation period until such time as the claimant discovers, or in exercising reasonable diligence should have discovered, facts that indicate he has been injured.").  The discovery rule applies in cases of fraud or fraudulent concealment, or in claims of fiduciary duty.  *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).  Under Texas law, where "the pleadings clearly show that the claims are barred by limitations . . . plaintiff, as the party seeking to benefit from the discovery rule, has the burden to plead . . . facts in order to avoid a limitations bar."  *Resolution Trust Corp. v. Boyar, Norton & Blair*, 796 F. Supp. 1010, 1013-14 (S.D. Tex. 1992); *see also Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 639 (S.D. Tex. 2007); *Woods v. William M. Mercer*, Inc., 769 S.W.2d 515, 518 (Tex. 1988).

Contrary to Defendants' assertions, Plaintiff has pleaded such facts.  Although the Complaint does not allege a particular date on which the purportedly fraudulent nature of the 2009 Distribution was discovered, it does allege that the Sterling Defendants owed fiduciary duties to the corporation.  (Doc. # 119 ¶¶ 121, 123.)  It also alleges that the Sterling Defendants hid the true liabilities of the Trust business and transferred money notwithstanding these liabilities, knowing that these liabilities would leave UWT insolvent.  (*Id.* ¶¶ 81-84.)  The Sterling Defendants might ultimately prevail by showing on summary judgment, as a matter of undisputed fact, that Plaintiff should have discovered (or did discover) the nature of the liabilities before or immediately after the sale of the Trust business, the Court cannot make this determination at this juncture.

The Sterling Defendants also argue that the Texas Business Judgment rule shields the directors from liability relating to the 2009 Distribution, because Plaintiff did not allege that the Sterling Defendants engaged in *ultra vires* or fraudulent acts in authorizing the 2009 Distribution, and "Texas courts to this day will not impose liability upon a noninterested corporate director unless the challenged action is ultra vires or tainted by fraud.  Such is the [B]usiness [J]udgment [R]ule in Texas."  *Gearhart Indus. v. Smith Int'l*, 741 F.2d 707, 721 (5th Cir. 1984); *see also FDIC v. Niblo*, 821 F. Supp. 441, 458 (N.D. Tex. 1993) ("The rule precludes judicial interference with the business judgment of directors of a corporation absent a showing of fraud or *ultra vires* acts.") However, contrary to the Sterling Defendant's assertions, the Complaint does sufficiently allege that the Sterling Directors engaged in *ultra vires* acts with regard to

the 2009 Distribution, including  a violation of TBOC § 21.303,[9] and Tex Bus. & C.

§§ 24.005 & 24.006.[10]  Additionally, as discussed above with relation to the "discovery

rule," the Complaint also sufficiently alleges that Plaintiffs engaged in fraudulent acts in

concealing Sterling's true liabilities, and making transfers relating to the Trust Business

sale notwithstanding those liabilities.  As such, Plaintiff has alleged sufficient allegations

to survive Defendants' Motion regarding the 2009 Distribution.

## B.    THE 2011 DISTRIBUTION

Similarly, Directors argue that Plaintiff has failed to allege facts to overcome

Colorado's Business Judgment Rule with regard to the 2011 Distribution.  Colorado's

Business Judgment Rule provides that without evidence of bad faith of fraud, the "acts

of directors for profit or non-profit corporations which are within the powers of the

corporations and within the exercise of an honest business judgment are valid." *Rywalt*

*v. Writer Corp.*, 34 Colo. App. 334, 337 (Colo. App. 1974).

Plaintiff contends that the Complaint alleges sufficient facts to support his

allegations of bad faith or fraud with respect to the 2011 sale of the Viatical business.

However, unlike the allegations relating to the 2009 Distribution, which provide that

Sterling Defendants engaged in fraud by concealing the liabilities of the Precious Metals

Scheme, the Complaint's allegations relating to the 2011 Distribution are "naked

---

[9] TBOC § 21.303 provides that unless the distribution is made in compliance with Chapter 11, a corporation may not make a distribution that leaves it insolvent.

[10] Tex Bus. & C. §§ 24.005 & 24.006 related to fraudulent transfers to creditors, which are made "without receiving a reasonably equivalent value in exchange for the transfer or obligation" when the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

assertion[s] devoid of 'further factual enhancement,'" and "do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678-79 (quoting *Twombly*, 550 U.S. at 557). Specifically, the Complaint alleges that, with respect to the sale and distribution of profits of UWT's Viatical business, Defendants McCloskey, Maxwell, and Abariotes "were acting as fiduciaries of UWT," and that the "Viatical Business Proceeds **were dissipated and not used to pay creditors** of UWT, including those creditors holding $4,000,000 of known contingent liabilities." Additionally, the Complaint alleges that "[f]ollowing the sale of the Viatical Business, UWT no longer had sufficient assets to continue its commercial enterprise or pay its creditors" and that the UWT Defendants "caused UWT to become insolvent after the **transfer or dissipation** of substantially all of its assets."[11]  (Doc. # 119, ¶¶ 97-100; 121) (emphasis added).

However, other than using the word "dissipation,"[12] Plaintiff has failed to provide factual allegations as to **how** or **why** the proceeds from the Viatical Business were "dissipated" by the UWT Defendants, beyond the naked and conclusory assertion that this "dissipation" amounted to a breach of fiduciary duty. To put it differently, the allegation fails to state a plausible claim because it is "an unadorned, the-defendant-unlawfully-harmed-me accusation" which "offers labels and conclusions." *Iqbal*, 556 U.S. at 667-78. *See* (Doc. # 119 at ¶¶ 124-25) ("The UWT Defendants were acting as

---

[11] In his Response to the Director's Motion, Plaintiff notes that the Third Amended Complaint alleged that the UWT Defendants "failed to obtain anything for UWT in exchange for the transfer of any portion of the Viatical Business Proceeds to Bancorp." (Doc. # 86 at 11; Doc. # 60 ¶ 67.) However, this allegation was removed from the Fourth Amended Complaint, and the Court does not consider it as the Fourth Amended Complaint is the most recent before the Court. *Compare* (Doc. # 60 ¶ 67) to (Doc. # 119 ¶¶ 93-100).

[12] Black's Law Dictionary (10th ed. 2014) defines "dissipation" as "[t]he use of an asset for an illegal or inequitable purpose."

fiduciaries of UWT with respect to distribution or use of the proceeds derived from the sale of the Viatical Business.  The UWT Defendants and Sterling Defendants breached their fiduciary duties to UWT.")  Moreover, Plaintiff describes the movement of assets as a "**transfer**," which does not imply bad faith or fraud.

Indeed, a careful reading of the Complaint reveals that there are no allegations to further substantiate the wrongfulness of the 2011 distribution **in particular**.  For instance, nowhere does the Complaint allege that there was self-dealing on the part of the UWT Defendants or that they acted in a grossly negligent or reckless manner in conducting the sale of the Viatical Business or in distributing the proceeds.  Although Plaintiff cites *Resolution Trust Corp. v. Heiserman*, 839 F. Supp. 1457 (D. Colo. 1993), in which Judge Babcock noted that "the applicability of the [B]usiness [J]udgment [R]ule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss," he made this observation in 1993, using the 12(b)(6) lens of the pre-*Twombly* era.  *Id.* at 1457 (citing the dismissal standard from *Gregory v. U.S./U.S. Bankr. Court for Dist. of Colorado,* 942 F.2d 1498, 1500 (10th Cir. 1991), that "Dismissal is proper only when it **appears beyond doubt** that no set of facts will support a plaintiff's right to relief") (emphasis added).  As such, Plaintiff has not alleged adequate facts to support his claims relating to the 2011 Distribution.

In his Response, Plaintiff requested leave to amend his Complaint.  First, motions included in a response are improper.  *See* D.C.Colo. LCivR. 7.1(d) ("A motion shall not be included in a response or reply to the original motion. A motion shall be made in a separate document.")  Additionally, Plaintiff has already filed four versions the

Complaint.  Judge Shaffer firmly warned Plaintiff at the June 16, 2014 status conference

(prior to the fourth amendment of the Complaint) that, "No client, no lawyer, has a right

to perpetually amend . . . You're not allowed a perpetual series of do-overs, and that's

where we pretty much are getting ourselves. So if you're going to do it, I would take

great pains to make sure this is the last one and it's done correctly."   (Doc. #64 at 5:19-

21.)  Defendant also notes that in addition to having already had four proverbial "bites at

the apple," Plaintiff has had the benefit of Defendant's books and records, and has

continued to fail to plead facts which are adequate to support the distribution of the

2011 claim.  Accordingly, the Court concludes that dismissal of this claim with prejudice

is appropriate, as the "complaint fails to state a claim under Rule 12(b)(6) and granting

leave to amend would be futile."  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219

(10th Cir. 2006).  Additionally, because Plaintiff's claims against Defendants Theodore

Abariotes and Paul E. Maxwell relate to the 2011 claim only, the Court dismisses them

both as Defendants.[13]   (*See* Doc. # 119 at ¶¶ 30, 95) (defining the "UWT Defendants"

as McCloskey, Abariotes, Maxwell and stating that "In or about September 2011, the

UWT Defendants caused UWT to sell the Viatical Business.")

## C.    UWBI'S MOTION ON THE PLEADINGS

Plaintiff, as Trustee, brings two claims against UWBI Group for fraudulent

transfer, under both federal law (11 U.S.C. § 544(b)) and Colorado law (C.R.S. § 38-8-

105(1)(a)).

---

[13] Defendant Michael McCloskey will remain as a Defendant, however, because he was also
allegedly involved in the 2009 Distribution.

Section 544 of the Bankruptcy Code contains what are commonly referred to as the trustee's "strong-arm" powers, which include the ability "to avoid any transfer of an interest of the debtor in property . . . that is avoidable under applicable law[.]" Generally, "applicable law" is interpreted to include state law causes of action, such as here, where the claim for relief is predicated upon the Colorado Uniform Fraudulent Transfer Act ("CUFTA").

As for Plaintiff's federal law claim against UWBI, in the Tenth Circuit, a trustee must avoid a transfer by obtaining a fraudulent transfer judgment against the **initial transferee**; notably, this judgment must be obtained **before** seeking recovery of the transfer from an intermediate or mediate transferee.  *See Weinman v. Simons* (*In re Slack-Horner*), 971 F.2d 577, 580 (10th Cir. 1992) (explaining that "in order to recover from a subsequent transferee the trustee must first have the transfer of the debtor's interest to the initial transferee avoided").  In the absence of a fraudulent transfer judgment, the trustee does not have a basis for recovering the property from the subsequent transferee.  *Id.*

UWBI argues that Plaintiff has failed to comply with this requirement because Plaintiff has not actually attempted to avoid the transfer in an action against the initial transferee, Bancorp.  In essence, UWBI asserts that the Trustee has failed to plead a claim upon which relief may be granted because the transfer to Bancorp has not been set aside and Bancorp is not a party to this action.

The Tenth Circuit employs the so-called "conduit" theory in determining whether an entity was an "initial transferee" of an asset, or merely a financial intermediary.

*Malloy v. Citizens Bank of Sapulpa*, 33 F.3d 42, 43-44 (10th Cir. 1994). "In order to be

a transferee of the debtor's funds, one must (1) actually receive the funds[,] and (2)

have full dominion and control over them for one's own account, as opposed to

receiving them in trust or as agent for someone else." *Rupp v. Markgraf*, 95 F.3d 936,

942 (10th Cir. 1996) (internal quotation omitted)*; Malloy*, 33 F.3d at 43 (internal

quotation omitted) ("'[T]he minimum requirement of status as a 'transferee' is dominion

over the money or other asset, the right to put the money to one's own purposes.'")  In

other words, "those who act as mere 'financial intermediaries' or 'couriers' are not initial

transferees."  *Rupp*, 95 F.3d at 941; *see also In re Slack-Horner*, 971 F.2d at 580

(noting that "[t]he term 'transferee' 'must mean something different' from 'possessor' or

'holder' or 'agent,' or 'anyone who touches the money'"); *Wadsworth v. High Speed*

*Aggregate (In re Trick Techs., Inc.*), 2013 WL 3865592, at *2 (Bank. D. Col. July 22,

2013) (stating that "[w]hen an intermediary party receives but does not gain actual

dominion or control over the funds, that party is considered a mere conduit or agent for

one of the real parties to the transaction").

Applying this test, the Court agrees that Bancorp was the "initial transferee" with

regard to the 2009 Distribution, and UWBI was merely an "intermediary party."

Although Plaintiff contends that Vintage Delaware was the "initial transferee" as a result

of receiving the funds first, "the initial transferee is the **first party to exercise dominion**

**and control** over the money or other asset," *In re Potter*, 386 B.R. 306, 310 (Bankr. D.

Colo. 2008) (emphasis added), and the Complaint alleges **no** facts indicating that

Vintage Delaware Holdings Inc. (or the other subsidiaries, for that matter) had full

dominion and control over the funds for the very brief period in which they possessed them.  Rather, Bancorp's subsidiaries received the money as agents or holders for Bancorp, and the money immediately passed to the next subsidiary and onto Bancorp. Indeed, Plaintiff's Complaint indicates that the "Sterling Defendants caused the Trust Business Proceeds **to be upstreamed** to Bancorp."  (Doc. # 119 at ¶ 81) (emphasis added).  Specifically, the Complaint alleges Sterling Defendants – including McCloskey, Bancorp's Executive Vice President, General Counsel, and Chief Operating Officer; and Snider, Bancorp's Vice Chairman – caused Vintage Delaware Holdings, Inc., and the Vintage Group to transfer the Trust Business Proceeds upstream on the very same day, in a single interaction.  (Doc. # 119 at ¶¶ 49, 51, 53, 55); *see also* (Doc. # 86 at 1) (emphasis added) ("Denver-based United Western Bancorp, Inc. ("Bancorp") stripped the assets of one of its subsidiaries, UWT, Inc. ("UWT") . . . . UWT's directors—**acting at Bancorp's behest**—surrendered the assets for no consideration, leaving UWT's creditors without recourse").  Additionally, the Complaint alleges that Bancorp had plans for this money, alleging that, after Bancorp received the Installment Obligation, it transferred approximately 92.5% of the Installment Obligation to another one of its subsidiaries, United Western Bank, "to cover its lack of capital liquidity in the amount of approximately $42.5 Million."  (*Id.* at ¶ 55.)  In sum, as UWBI and Vintage Delaware Holdings, Inc. were not "initial transferees," Plaintiff's claim against them under 11 U.S.C. § 544(b) fails as a matter of law.

Under *In Re Slack-Horner*, the avoidability of the initial transfer must be determined in litigation brought against the initial transferee; consequently, complete

relief cannot be granted to the Trustee unless Bancorp is joined as a party. *In re Brooke Corp.*, 443 B.R. 847, 852 (Bankr. D. Kan. 2010) (citing *In re Slack-Horner*, 971 F.2d at 580, n. 1). As such, Bancorp is a necessary party. Rule 19(a)(2) provides: "If a person has not been joined as required, the court must order that the person be made a party." Accordingly, the Court will thus require that Bancorp be joined as a Defendant. If joinder is not feasible, the Trustee shall so inform the Court within 14 days of this Order and the Court will hold a Rule 19(b) hearing.

Accordingly, the only claim remaining is UWBI's state-law claim under C.R.S. § 38-8-105(1)(a) (for actual fraudulent transfer) and (1)(b) (for constructive fraudulent transfer), relating to the 2009 Distribution. C.R.S. § 38-8-105 provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

"A claim for actual fraudulent transfer pursuant to § 548(a)(1)(A) or applicable State law must satisfy the requirements of Rule 9(b) of the Federal Rules of Civil

Procedure," and "[t]o establish a claim for actual fraudulent transfer under § 548

(a)(1)(A), a plaintiff must plead facts showing that the transfer was made by the

defendant with the intent to hinder, delay or defraud present or future creditors of the

transferor." *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.*

(*In re Verestar, Inc.*), 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006); *Koch v. Koch Indus.,*

*Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (holding a "[c]omplaint alleging fraud [must]

set forth the time, place and contents of the false representation, the identity of the party

making the false statements and the consequences thereof").

Plaintiff provides sufficient facts to meet this heightened standard.  Specifically,

he alleges the following:

- "From at least October 2008 when the Sterling Defendants were negotiating the sale of the Trust Business, through June 29, 2009 when the Sterling Defendants caused the Trust Business Proceeds to be upstreamed to Bancorp and up to at least September 2011, the Sterling Defendants knew that UWT had contingent liabilities of approximately $4,000,000[.]"  (Doc. # 119 at ¶ 81).

- "At all times relevant to this Complaint, the Sterling Defendants took steps to ensure that the $4,000,000 of known contingent liabilities would be omitted from the books of UWT."  (*Id.* at ¶ 82.)

- "Because it was a financial institution subject to capitalization requirements, the State of Texas required UWT to retain Two Million Dollars ($2,000,000) in liquid cash assets (the 'Retained Proceeds')."  (*Id.* at ¶ 67.)

- "The $4,000,000 of known contingent liabilities exceeded the Retained Proceeds. Consequently, the fraudulent transfers of the Trust Business Proceeds rendered UWT insolvent and left with assets which were insufficient to pay its creditors."  (*Id.* at ¶¶ 83-84.)

Thus, the Complaint contains allegations that, from 2008 to 2011, UWT knew

that the transfer of the 2009 Distribution would leave UWT with insufficient assets to pay

its known contingent liabilities; engaged in fraudulent behavior in taking "steps to ensure that the $4,000,000 of known contingent liabilities would be omitted from the books of UWT"; and transferred the money to other franchisees (and ultimately to Bancorp) despite this knowledge.   These allegations are sufficient to state a claim under both C.R.S. § 38-8-105(1)(a) and (1)(b).

Additionally, although UWBI asks the Court to apply "common sense and basic math skills" when interpreting the Complaint in concluding that Plaintiff failed to properly allege that UWT was insolvent under C.R.S. § 38-8-105 (Doc. # 131 at 7), the Complaint does allege that UWT transferred approximately $60.2 million in assets, retained a single illiquid asset (the viatical business, which was sold for $700,000), and faced contingent liabilities of approximately $4,000,000.  (Doc. # 119 at ¶¶ 81-84, 93-96).  Accordingly, on the face of the pleadings, UWT's liabilities far exceeded its assets, which is the definition of insolvency.  C.R.S. § 38-8-103(1) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation").  UWT's purported insolvency is also supported by Plaintiff's citation to the Texas state regulatory requirement that it had to retain retain at least $2,000,000 in cash.  (*Id.* at ¶ 67).

In sum, because UWBI was not an "initial transferee" under 11 U.S.C. § 544(b), Plaintiff's claims under that statutory provision fails as a matter of law.  However, Plaintiff's Colorado law claim against UBI pursuant to C.R.S. § 38-8-105(1)(a) and (b) remains.

IV.  **CONCLUSION**

Based on the foregoing, it is ORDERED that the Directors' Motion to Dismiss (Doc. # 72) is GRANTED IN PART AND DENIED IN PART.  Specifically, the Court DISMISSES WITH PREJUDICE the claims relating to the sale of the Viatical Business and the 2011 Distribution.  The Court DENIES the Motion in all other respects.  It is

FURTHER ORDERED that Defendants Theodore Abariotes and Paul E. Maxwell are DISMISSED WITH PREJUDICE.  It is

FURTHER ORDERED that Bancorp shall be joined as a Defendant.  If joinder is not feasible, the Trustee shall so inform the Court **within 14 days of this Order** and the Court will hold a Rule 19(b) hearing.  It is

FURTHER ORDERED that Defendant UWBI Group LLC's ("UWBI's") Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) (Doc. # 126) is GRANTED IN PART AND DENIED IN PART.  Specifically, the Court DISMISSES WITH PREJUDICE Plaintiff's claims against UWBI group arising under 11 U.S.C. § 544(b), and DENIES the Motion in all other respects.

DATED:   March 31, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge